**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DIANA L. BRAGG,**

**Plaintiff,**

v.

**Civil Action No. 2:09CV65
The Honorable Robert Maxwell**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment, Plaintiff's Motion to Include Lost Documents, and Plaintiff's Motion to Remand Based on New Evidence, and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. Procedural History

Diana L. Bragg ("Plaintiff") filed applications for SSI and DIB on September 8, 1999. Those applications were denied at the initial determination level and Plaintiff did not pursue them further. On November 25, 2002, Plaintiff submitted new claims for DIB and SSI, which claims were pursued through a hearing by an Administrative Law Judge on March 18, 2004. The ALJ, Steven Slahta,

entered an unfavorable Decision on June 4, 2004 (R. 44-64). The Appeals Council denied Plaintiff's request for review, and Plaintiff timely filed a Complaint in this Court on September 19, 2005 (See 2:05cv71). United States Magistrate Judge James Seibert entered a Report and Recommendation on August 20, 2007, finding substantial evidence supported the ALJ's decision that Plaintiff was not disabled at any time prior to the decision of June 4, 2004.

Plaintiff filed objections to the Magistrate's Report and Recommendation; however, the District Court, United States District Judge Robert E. Maxwell, accepted the R&R in whole, Granting Defendant's Motion for Summary Judgment, Denying Plaintiff's Motion for Summary Judgment, and dismissing the case.

Plaintiff filed the current applications for DIB and SSI on September 17, 2004, and June 5, 2004,[1] respectively, alleging disability beginning October 12, 2002, due to bulging disc, spurs, pinched nerves, lower back pain, muscle spasms, arthritis, chronic lumbar strain, spondylosis, intermittent lumbar root syndrome, depression, and upper back pain (R. 109). Plaintiff's applications were denied at the initial and reconsideration levels (R. 19) Plaintiff requested a hearing, which Administrative Law Judge Norma Cannon ("ALJ") held on February 26, 2007 and at which Plaintiff, represented by an attorney, and James Ganoe, a Vocational Expert ("VE"), testified (R. 19). On May 29, 2007, the ALJ entered a decision finding Plaintiff was not disabled (R. 38).The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

---

[1]This date is immediately following the prior unfavorable ALJ decision, but three years prior to the prior decision of this Court.

Plaintiff was born on April 14, 1958, and was 46 years old on her alleged onset date, and 49 years old on the date of the ALJ's decision. She completed a Bachelors degree and has worked as a park attendant, grill cook, and case manager (R. 37). She last worked in 2002. Because the United States District Court already affirmed the ALJ's decision of June 4, 2004, the undersigned is limited in this matter to adjudicating the period since June 5, 2004, the day after the prior hearing decision.

On March 23, 2004, Plaintiff presented to the hospital clinic for follow up of her back pain R 339). She said she was going to the pain clinic. She had an upper respiratory infection, but was otherwise doing "fairly good." Her back was still tender. She was diagnosed with hypothyroid, musculoskeletal back pain and high blood pressure.

On May 11, 2004, Plaintiff presented to the hospital clinic for a follow up (R. 338). She was under increased stress due to the fact that her five grandchildren and two daughters-in-law moved in with her. She was still going to the pain clinic for her back, and at least could sleep at night. Her back was tender. She was diagnosed with allergic rhinitis, musculoskeletal back pain, sciatica, and high blood pressure.

On May 19, 2004, Plaintiff presented to the hospital clinic for a pain shot for her back pain (337). She complained of one week of back pain .

On May 21, 2004, Plaintiff presented to the hospital clinic for a pain shot for her back pain (336).

On June 7, 2004, Plaintiff presented to the hospital pain clinic with complaints of pain in the right upper quadrant that had started the previous Saturday (335). She had had her gall bladder removed previously.

Plaintiff followed up regarding her back and abdominal pain at the hospital clinic on June

21, 2004 (334). She was diagnosed with right carpal tunnel syndrome, back pain, right sciatica, and allergic rhinitis. She was prescribed a right carpal tunnel splint.

On July 23, 2004, Plaintiff presented to the Know Pain Clinic for follow-up on her chronic pain complaints in the primarily low back area radiating into the hips (R. 306). It seemed a little worse on the right than left. The average severity was between 7 and 9 out of 10. It was a constant, deep, dull, throbbing ache, generally worse by late evening. Any significant amount of activity or movement increased pain. She did minimal activities of daily living. She had overall increased pain this month. Her sleep averaged 4-5 hours. Her appetite was fairly good. She reported trying to walk regularly, but was less able the last month due to increased pain. Upon examination there was generalized facet and SI tenderness bilaterally worse on the right than left. There was some restriction of range of motion. Gait was controlled but not particularly favoring the right side today.

The diagnosis was sacroiliitis, right greater than left, and facet arthropathy, right greater than left. She was prescribed Lortab, Celebrex, and Zanaflex. She was offered injections "but prefers to hold those until the colder months." She needed no neurosurgical or psychological consults. She was "strongly encouraged" to get back into walking and exercise regimen.

On August 23, 2004, Plaintiff followed up at the hospital clinic for her back (R. 333). She said she still had low back pain. She was still going to the pain clinic but her back hurt too much for her to function at this time.

On August 25, 2004, Plaintiff presented to Know Clinic for follow up (R. 304). She said the pain was in her head, low back, and legs. It was at a level 6 out of 10 with medication. Bending, standing, and lifting exacerbated the pain. Lying down, elevating her feet, heat, and a TENs Unit helped alleviate the pain. Plaintiff said the last two months had been really bad, with only one good

4

week out of the past eight. She did not exercise or walk. She had a good appetite. Upon examination her low back revealed tenderness in the SI joint, right more than left, with mild facet tenderness bilaterally at L4/5. The diagnosis was sacroiliitis, facet arthropathy, occipital neuritis, and myofascial pain. She was prescribed Lortab, Zanaflex, Zonegran and Celebrex. She was to have nerve block injections. The doctor found no need for neurosurgical or psychological consult. She was encouraged to be as active as tolerable, and to do stretching and range of motion exercises.

On September 20, 2004, Plaintiff presented to the hospital clinic, stating her thyroid was causing her problems. All she wanted to do was cry (R. 331). She was described as "weepy."

On September 23, 2004, Plaintiff followed up with the Know Clinic for her chronic pain complaints (R. 302). She was doing fairly well this month, better than in quite some time. Her average pain was only 3-5 out of 10, with medications. Generally it was aching in the neck and back. Nerve blocks were quite helpful and after a month were still working somewhat. Prolonged standing or bending were particularly aggravating. Upon examination her low back was more notably tender in the right greater than left facet area. Some midline lumbar tenderness was noted. Pain was made worse by extension and axial rotation. Flexion was slightly decreased. There were no motor or sensory deficits. She was diagnosed with sacroiliitis, facet arthropathy, occipital neuritis, and myofascial pain syndrome. She remained "very stable," with improved function. She could do her activities of daily living as long as she had her medications. She did not desire any injections at this time.

On October 20, 2004, Plaintiff presented to the hospital clinic for follow up (R. 330). She said she had episodes of pain in the back of her neck which caused numbness in her jaw. She had her blood pressure checked and it was 70/50. She was diagnosed with a TIA-type event and

prescribed Plavix.

On October 21, 2004, Plaintiff followed up with the Know Clinic for her chronic pain (R. 300). She reported mostly neck pain, along with shoulder and low back pain. It was dull and aching in nature, and rated 5 out of 10 with medication. It was constant. Medication helped, while increased activity, bending, and standing made it worse. She complained of some numbness and tingling in the face. Plaintiff said she tried to do some walking and stretching. On physical examination her neck was supple. Some paracervical muscle spasm was noted. She complained of some numbness in the lower part of her face. Low back exam showed no localized swelling, deformity or redness. Some paraspinal tenderness was present as well as moderate sacroiliac joint tenderness, right side more than left. Her gait was mildly antalgic. She was diagnosed with facet arthropathy and sacroiliitis; cervical disc herniation from C6 to7 with possible cervical radiculopathy; occipital neuralgia; myofascial pain; and suprascapular neuritis. She was able to do her daily activities with her medications. She stayed functional and her pain level stayed around 4-5 out of 10. She was advised to continue physical therapy and stretching exercises.

On November 3, 2004, Plaintiff presented to the hospital clinic for her annual exam (R. 328). Her only complaint was persistent back pain but not as bad as two weeks ago. She had no other new complaints.

On November 9, 2004, Plaintiff underwent an MRI of the cervical spine, MRI of the brain, and CT of the cervical spine for her complaints of headaches, cervical pain radiating into both arms for three months, neck pain, and facial parasthesia (R. 197). MRI of the brain was normal (R. 202). The cervical spine showed multi-level degenerative disc and joint disease from C4-5 through C6-7, with foraminal narrowing most pronounced at C5-6 on the left side (R. 197). MRI showed

significant multi-level cervical spondylosis with bony hypertrophic spurring most pronounced on the right side at C4-5, C5-6, and C6-7 levels. A frank disk herniation was not evident. The spinal cord itself was unremarkable.

On November 1, 2004, Plaintiff followed up with the hospital clinic (R. 329). She said her pain medications were not working. The pain clinic told her to see the doctor for prescriptions. She still had facial paresthesia, and Dr. Swisher felt it was due to her pain medications. She stopped all pain medications. She was diagnosed with chronic persistent current pain, high blood pressure, and facial paresthesia.

On December 8, 2004, Plaintiff was examined by Miraflor Khorshad, M.D. for the State Disability Determination Service (R. 162) (R. 162). Plaintiff complained of low back pain radiating to both legs; inability to stand or walk for prolonged period of time due to back pain; inability to lift objects or do housework due to pain; shoulder pain; numbness in face when in pain; and no desire to do anything (R. 162-163). Plaintiff reported having chronic fatigue (R. 163). She said she had lost about 100 pounds from dieting. She had chills but no fever or night sweats. She had chronic headache, failing vision, but no halos, no ringing in the ears, no sinus problems, or nosebleed. She had a stiff neck with decreased motion of the neck at times. She had a thyroid problem and chest pain. She had shortness of breath when walking, but no coughing or wheezing. She had nausea and constipation, but no chronic abdominal pain, vomiting or diarrhea. She had weakness, but no dizziness, seizures, fainting spells, or tics (R. 163).

Upon physical examination Dr. Khorshad found Plaintiff was 46 year old, appeared her stated age, and was in no respiratory distress (R. 164). She was 59 ½" tall and weighed 227 pounds. Her blood pressure was 124/82. Lungs were clear to auscultation. Heart had normal sinus rhythm with

no murmur or thrill.

Plaintiff's extremities showed no joint swelling or effusion and no pedal or leg edema. She had no sensory or reflex abnormalities. She did not need an assistive device. She was able to get on and off the examining table. She could heel to toe walk and sit and squat. Her upper and lower extremity strength was 4/5 bilaterally. She had good range of motion. She was alert and oriented. Her corrected distance vision was normal at 20/25, and her corrected near vision was 20/40.

Plaintiff's right hand grips were 15, 25, 35, and 25. Left hand grips were 10, 20, 25, and 25.

A Zung analysis indicated the presence of severe to extreme depression.

Dr. Khorshad diagnosed Lumbar Strain and Chronic Depression (R. 165). He concluded that Plaintiff had a chronic back pain but had good range of motion "which is possibly a good response to her medications" (R. 166). He recommended psychological counseling and treatment of her depression to help improve pain management.

A Range of Motion Form indicated Plaintiff's range of motion of both arms was normal (R. 167). Elbows and hands were also normal, and fine manipulation was normal. Grip strength was 4/5 as was upper extremity strength. Knee range of motion was normal. Lumbar spine flexion, extension and lateral flexion were all normal and straight leg raising was negative at 90 degrees bilaterally (R. 168).

Dr. Fulvio Franyutti, M.D., State agency reviewing physician, completed a Residual Functional Capacity Assessment ("RFC") on January 7, 2005, concluding that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds (R. 170). She could stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. She could occasionally perform all postural movements. She had no manipulative limitations, including

reaching overhead and fine manipulation (R. 172). She had no visual limitations. She should avoid concentrated exposure to temperature extremes and hazards, but had no other environmental limitations (R. 173). Dr. Franyutti found Plaintiff partially credible, and reduced her RFC to light (R. 176).

On March 30, 2005, Plaintiff underwent a Psychological Consultative Evaluation performed by Nancy Price, MA, supervised psychologist, and Kay Collins-Ballina, MA. licensed psychologist (R. 177). Ms. Price first observed that Plaintiff was cooperative and alert and rapport was easily attained. Hygiene was good. Posture was straight and gait was steady and no ambulatory aids were used. Plaintiff was referred to the Disability Determination Section to determine eligibility for disability benefits. She was applying for benefits due to the following allegations: depression, spondylosis, chronic lumbar strain, and intermittent lumbar root syndrome. Her alleged onset date was October 2002, when she had last worked. She had not attempted to return to work.

Plaintiff reported to Ms. Price: "I'm falling apart." She reported her chronic back and groin pain interfered with daily functioning, specifically sleeping, completing routine household duties, and riding in vehicles. She presented with few affective symptoms. She indicated Wellbutrin was successful in alleviating depressive symptoms. She did report anhedonia because of her inability to be physically active and more self sufficient. She denied being suicidal or homicidal. She had been placed on an anti-depressant in the 80's due to mood swings caused by irregular menses. She was currently on Wellbutrin, but denied past or current inpatient or outpatient treatment for psychiatric issues.

On Mental Status Exam, Plaintiff appeared her stated age and was above average in weight for her height (R. 178). She was dressed casually and neatly. She was cooperative and alert; speech

was coherent and relevant; she was fully oriented; her mood was dysphoric, and her affect broad and reactive. Her thought process was logical and coherent. Her insight was good and judgment and psychomotor behavior within normal limits. Her immediate memory was normal, recent memory was mildly deficient, and remote memory was normal (R. 179). Concentration was moderately deficient. Persistence was within normal limits, as was pace. Regarding social functioning, Plaintiff was engaged, made good eye contact, and answered all questions.

Plaintiff described her typical day as rising at 7 a.m., taking her medications, and eating breakfast (R. 179). She completed routine household duties and took naps throughout the day. She watched the evening news and went to bed at 11:30 p.m. She ate three meals a day. Without assistance, she could complete personal hygiene. She could do routine household tasks, but with frequent breaks. She had difficulty driving and grocery shopping because of the prolonged sitting and walking exacerbating her back pain. Plaintiff reported going out to eat with her husband and to Sunday School each week (R. 192). She also spent time with her children and grandchildren.

Ms. Price diagnosed Depressive Disorder Not Otherwise Specified (R. 179) and found Plaintiff's prognosis good.

The psychologist completed a Psychiatric Review Technique ("PRT"), finding Plaintiff had an affective disorder and anxiety-related disorder, but no severe mental impairment (R. 180). Her functional limitations were all rated as "mild" and she had no episodes of decompensation.

On April 26, 2005, Plaintiff presented to the KNOW clinic for complaints of pain in her low back, hips, mid back and neck (R. 298). Her medications helped but she still had a significant amount of pain. She tried to do what she could around the house like washing dishes. She also reported a lot of stomach problems.

Plaintiff's current medications were Percocet, Zonegran, and Zanaflex. It was noted she did not do much exercise. She said she was taken off all NSAIDS due to her stomach complaints. Upon examination her back had no obvious deformity, edema or erythema. There was paravertebral tenderness, and bilateral SI joint tenderness. She was diagnosed with lumbar facet joint arthropathy and sacroiliitis, myofascial pain syndrome, cervical radiculopathy with intermittent suprascapular neuritis, and occipital neuritis. She was given a shot of Toradol. She was advised to be as active as possible with walking, range of motion exercises, and stretching.

On April 26, 2005, Plaintiff underwent an MRI of the lumbar spine for her complaints of persistent back pain (R. 194). It showed slight decreased disk signal at L4-5 and L5-S1; posterior disk straightening without herniated nucleus pulposes ("HNP"); a 3 mm anterior subluxation of L4 on L5; mild osteoarthritic lumbar vertebral body lipping; and very mild canal compromise at L4-L5 (R. 190).

On May 6, 2005, Plaintiff presented to the hospital clinic for follow up of her MRI (R. 327). She was still having neck pain radiating down her right arm. She also complained of sinus pain and pressure. She was diagnosed with sinusitis, chronic neck pain–worse; chronic back pain, and high blood pressure.

On May 15, 2005, Plaintiff presented to orthopedist Beverly Epstein, MD, for her complaints of neck pain for 2-3 years and back pain for 10 years (R. 266). Upon examination her neck range of motion was within normal limits, with complaints of neck tightness and pulling. She did have a significant amount of tightness in the right upper trapezius. She was very teary-eyed, stating that she was in too much pain to do anything. Her left shoulder was tender at the AC joint. Her strength was 5/5 throughout. Sensation was intact throughout. Gait was within normal limits. Low back had

normal lordosis. Flexion led to low back pain. Extension led to bilateral low back pain radiating into the hips. There was no scoliosis. Long-sitting test was negative. Leg length was equal. Range of motion of both hips was normal but with complaints of tenderness. Straight leg raise was negative to 70 degrees on the right with complaints of low back pain and 80 degrees on the left with no complaints.

The assessment was degenerative disc disease of the lumbosacral spine at L4-5; Lumbago; developmental spondylolisthesis with L-4 pars intra-articularis defect; cervical spondylosis; degenerative disc disease of the cervical spine; cervicalgia; bilateral greater trochanteric bursitis; and left AC bursitis (R. 268).

The following were recommended:

1.  Icing and deep friction massage for hips and left shoulder. Learn proper body mechanics in the sitting posture.

2.  A home exercise program using shoulder blade squeezes, hip exercises, lumbar spine program, cervical traction with exercises and Kendall's exercises.

3.  A walking program. She was told to walk a quarter mile for about a month until her hips improved and then increase by a quarter mile weekly thereafter until she could walk 1-3 miles a day.

She would be seen in 3-4 months to upgrade her program.

On May 20, 2005, Plaintiff followed up at the hospital clinic regarding her ears (R. 326). Her ears were so much better. She had questions about her chronic back and neck pain. She was diagnosed with resolved otitis and chronic back and neck pain.

Plaintiff had a back evaluation for physical therapy on May 23, 2005 (R. 228). The evaluator

noted she had a sloped shoulder and increased lordosis.  She was non tender to light touch.  The evaluator believed Plaintiff's rehabilitation potential was good.  Plaintiff attended physical therapy on May 23, 24, 26, and June 1, 2, 3, 7, 8, 9, 14, 15 (R. 227).  She tolerated the treatment well without difficulty (R. 226).  She reported overall frequency of pain was decreased on May 26.  She was slowly making gains toward her goals.  On June 1, Plaintiff reported her back was hurting more when she was driving, but after being out of the car she was feeling a little better (R. 225).  On June 7, Plaintiff reported feeling better (R. 224).  The next day, however, she reported she was hurting all over with pain at a level 7-8 out of 10.  The next day the pain was a little less (R. 223).  She cancelled her appointment on the 14th.  On the 15th, she stated: "I'm not really having any pain today. I guess there is a first time for everything."  Her left shoulder range of motion was normal, as was her cervical spine and left hip.

On May 25, 2005, Plaintiff returned to the KNOW clinic for follow up (R. 296).  She said the pain was 5 out of 10 with medication.  Standing and activity exacerbated the pain and lying down helped alleviate it.  Examination revealed no obvious deformity, erythema, or edema.  She had tenderness of the right SI, and reported mild radicular symptoms in the right leg without specific dermatomal distribution.

On June 16, 2005, Plaintiff told her physical therapist she only had pain when she stood for long periods of time (R. 222).  Her back pain was 6/10 and her neck was only 3/10.  Overall she had decreased pain and was performing activities of daily living better.

On June 20, 2005, Plaintiff complained of intermittent 7/10 lumbar and hip pain (R. 222).  She noted she had therapy on Monday, Wednesday, and Thursday, and by Saturday started having bad days again.  On June 22, 2005, Plaintiff report she felt "pretty good" with no complaints of pain (R. 220).

13

On June 22, 2005, Plaintiff presented to the KNOW clinic for follow up (R. 294). She said she still had pain in her mid back going into the right hip but that she had started physical therapy and it was helping quite a bit, and she did not require any injections. Her stomach had much improved. The worst the pain in the last month was 8 or 9 out of 10, but the medications kept it around 2. She still tried to do what she could around the house like washing dishes.

On June 27, 2005, Plaintiff presented to the hospital with complaints of chest pain (R. 203). She described the pain as "pressure" and rated it a 7 out of 10. She said it lasted 2-3 minutes then diminished on its own. It was not now subsiding, however. She denied any gastric symptoms. EKG revealed some minor changes and CPK was elevated. Plaintiff was therefore admitted to rule out a myocardial infarction. Plaintiff's hospital course was without incident. She was discharged home. Her discharge diagnosis was chest pain rule out MI; GERD; chronic low-back pain (R. 203).

Plaintiff cancelled her physical therapy on the 27th and 28th, due to having been in the hospital (R. 219).

On July 6, 2005, Plaintiff told her physical therapist she had had to spend a week in the hospital for chest pain (R. 217). She was told she could return to physical therapy but could not do anything strenuous. On July 7, Plaintiff complained of intermittent 4-5 out of 10 low back pain (R. 217). She said her hip had been doing good "until all this rain started."

On July 11, 2005, Plaintiff told her physical therapist she had pain on a level of 10 out of 10 after shopping at WalMart over the weekend and doing a lot of walking (R. 216).

On July 12, 2005, Plaintiff presented to James Whittle, M.D. for her complaints of chest pain (R. 211). Upon physical examination, Plaintiff's blood pressure was 92/70, breath sounds were equal with no rales, wheezes or rhonchi. Heart had no gallop or murmur. Electrocardiogram was

normal. Dr. Whittle stated that his suspicion was that Plaintiff's chest discomfort was non-cardiac in origin, but since she was hypertensive he wanted to do a myocardial perfusion scan.

On July 15, 2005, Plaintiff reported pain before physical therapy, but none afterward (R. 215). She reported pain level of 0/10 when resting, with more pain upon waking up in the morning (R. 215).

On July 19, 2005, Plaintiff reported that the exercises seemed to help. Her back and hip were hurting when she came in but were not bothering her anymore. She reported an 80% improvement since starting therapy (R. 214).

On July 20, 2005, Plaintiff followed up at the KNOW Clinic for her chronic pain complaints (R. 292). She reported her average pain was at a level 5 typically. She was in the hospital for a day in the past month for chest pain. She had a negative work-up but a stress test scheduled, although the cardiologist did not think there were any abnormalities. There was overall no change in her pain. She could generally do the basic activities of daily living as long as she has current medication. She denied any numbness, tingling, or burning. She was continuing with her physical therapy. She slept an average of six hours, and had a fairly good appetite. She had tenderness to palpation throughout the mid and paraspinal lumbar areas, on the right greater than the left facet and SI regions. There were no motor or sensory deficits noted, but some increased tone and palpable tenderness along both suprascapular notches and mild occipital tenderness as well.

She was diagnosed with lumbar facet arthropathy, sacroiliitis; myofascial pain syndrome with intermittent cervical radiculopathy; suprascapular and occipital neuritis. She was encouraged to continue physical therapy. No neurosurgical or psychological consults were necessary, and she deferred any injections.

On July 22, 2005, Plaintiff had no new complaints (R. 213). On July 26, she reported her neck was so sore she couldn't even get her seat belt on (R. 213). She did not show for physical therapy after that appointment, stating on August 3, 2005, that she wanted to put it on hold until after she saw her doctor on August 12 (R. 212).

On July 27, 2005, Plaintiff underwent a Myocardial Perfusion Scan (R. 209). The impression was no significant reversible ischemia and normal LV systolic function with EF about 53% with no obvious significant regional wall motion abnormality.

On August 15, 2005, plaintiff followed up at the hospital clinic, complaining of being just about at her wit's end. She could not tolerate the pain in her hips and left shoulder. She said she was told by a specialist that it was bursitis of the AC joint and hips. She had an appointment at the pain clinic. She was diagnosed with chronic pain syndrome, hypothyroid, and medication monitoring.

On August 17, 2005, Plaintiff presented to the KNOW clinic for follow up of her chronic pain (R. 290). The average severity of her pain was around 4-5 out of 10. It was a throbbing aching in the back, legs, hips, neck, and shoulders. Walking and standing were particularly aggravating. She was generally able to do basic activities of daily living. She was trying to walk and do her stretching exercises regularly. Upon exam there was some left AC tenderness and bilateral trochanteric bursa tenderness, a little more impressive over the CI's today, and milder facet region. Some generalized increased tone and palpable tenderness along the superior and medial scapular border. The diagnosis was lumbar fact arthropathy; sacroiliitis; myofascial pain syndrome; intermittent cervical radiculopathy; and suprascapular neuritis. Injections were recommended, and Plaintiff was advised to keep doing her stretching, walking, and exercise regimen. She was continued on her medication, because she continued to assert improved functional ability and quality

of life.

On September 13, 2005, Plaintiff followed up with the KNOW clinic for her complaints of chronic pain (R. 288). The average pain severity was around 6, aggravated by any activity and alleviated by lying down. She could generally do basic activities of daily living if she had her medications although significant activity did increase her pain. Upon examination she remained palpably tender over the left AC and over both trochanteric bursa. There was some milder facet and SI tenderness and some restriction of range of motion of the lumbar spine. She continued to assert improved functional ability and quality of life from the medication. No neurosurgical, physical therapy, or psychological consults were felt to be necessary at this time. She was encouraged to continue her regular activity regimen.

On December 1, 2005, Plaintiff presented to neurologist Larry Carson, MD, with PA-C Leah Holloran for her complaints of low back pain and bilateral lower extremity pain (R. 260). Upon examination, Plaintiff's gait and station were "somewhat labored." Her strength was 5/5 bilaterally and full. There was no sign of spasm. Sensation was intact. Straight leg raising was negative. Plaintiff was over 150 pounds above her ideal body weight. Dr. Carson recommended she lose at least 100 pounds to see if this could decrease some of her pain. He suggested a bariatric surgery consultation. He believed if she lost 100 pounds and continued to have pain, he would consider back surgery, but that, at her current weight, it would likely fail.

On December 9, 2005, Plaintiff presented to the KNOW clinic for follow up (R. 286). She still had pain in her low back and legs, but no numbness, burning, tingling, or swelling. The increased medication helped with the burning. Medications kept her pain at about a level 4. As long as she was taking the medicine she was able to do things around the house like clean house, wash

dishes, and take out the trash. Standing for long periods of time made the pain worse. She had gone to see Dr. Epstein, a specialist, who gave her an epidural injection, which she said helped for about a week. On examination, Plaintiff had no obvious deformity, edema or erythema. There was paravertebral tenderness in the lumbosacral area and bilateral SI joint tenderness and bilateral trochanteric tenderness. She was diagnosed with lumbar facet joint arthropathy and sacroiliitis; associated myofascial pain syndrome and suprascapular neuritis; intermittent cervical radiculopathy; bilateral trochanteric bursitis; and osteoarthritis left AC joint. She was doing well on her medications and deferred any injections. She was advised to be as active as possible with walking, range of motion exercise, and stretching. No new consultations were necessary.

On December 16, 2005, a State agency reviewing physician completed an RFC, finding Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday (R. 231). She could occasionally perform all posturals. She had no manipulative limitations, including reaching overhead and fine manipulation. She had no visual limitations (R. 233). She should avoid concentrated exposure to temperature extremes and hazards (R. 234). The doctor found Plaintiff only partially credible (R. 235).

On January 17, 2006, neurologist David Libell, M.D. saw Plaintiff for her complaints of carpal tunnel syndrome (R. 254). He noted she had carpal tunnel syndrome in 2004, and had bilateral release procedures. She was asymptomatic until about one year ago, when the pain returned. It occurred frequently when driving, but at other times as well. It usually improved within a few minutes after decreasing activity. It occasionally bothered her at night.

Dr. Libell noted that Plaintiff's neurological exam was normal, specifically with no weakness

of the hand muscles or sensory abnormalities. He did opine it was possible she had a return of carpal tunnel syndrome, and suggested an EMG. He also asked her to wear wrist splints at night for now.

On January 20, 2006, Plaintiff presented to the KNOW Clinic for follow up and refill of medication (R. 284). She was complaining of pain in her back, across the hips. The severity was 7 out of 10. Plaintiff washed her own dishes and was not employed. She was sleeping only three to four hours a night. Her appetite was good. She did very little exercise and denied chest pain, daytime somnolence or over-sedation. There was paravertebral tenderness in the lumbosacral area, and bilateral SI joint tenderness, and bilateral trochanteric tenderness. She was diagnosed with lumbar facet joint arthropathy and sacroiliitis; associated myofascial pain syndrome with suprascapular neuritis; cervical radiculopathy; bilateral trochanteric bursitis; and osteoarthritis of the left AC joint. She deferred injection at this time. She was advised to be as active as possible.

On January 24, 2006, State agency reviewing psychologist John Damm, EdD completed a PRT, finding Plaintiff had an affective disorder, but that it was non-severe (R. 238). Any functional limitations were mild and she had had no episodes of decompensation. Dr. Damm concluded that Plaintiff's depression had improved in the past year. She was responding to Wellbutrin and did not appear to be receiving mental health services at this time (R. 250).

Plaintiff underwent an EMG on February 7, 2006 for her complaints of neck pain, carpal tunnel syndrome, and cervical radiculopathy (R. 252). It showed mild to moderate right carpal tunnel syndrome.

On February 15, 2006, Plaintiff went to the Hope Medical Center requesting a Toradol injection for her back (R. 271). She said her last one had been a month ago.

On February 17, 2006, Plaintiff presented to the KNOW Clinic for follow-up (R. 282). She

said she was having a particularly bad month because of the cold weather and weather changes. She had had a lot of pain in the lumbar area. She had some disc degeneration and disc straining. She was having an increase in numbness, tingling and burning into both legs. She said she had had an epidural that gave her no relief, and other injections that were of no help. Her pain medications were not helping at this time. Upon examination, she had moderate cervical tenderness, paracervical and occipital tenderness, bilateral suprascapular notch tenderness; pain with flexion and extension of the cervical spine; tenderness in the thoracic area and moderate facet and SI tenderness and bilateral trochanteric tenderness. Her medications were changed to Percocet, Lyrica, Soma, and Prevacid to see if they helped. She deferred injectables, saying they lasted only about a week. She was advised to be as active as possible when her pain would allow.

On March 17, 2006, Plaintiff followed up at the KNOW clinic for her chronic pain (R. 280). She reported low back pain into her hip and leg, on a level of only 1 out of 10 with medications. Medication helped her quite a bit, and increased activity made it worse. She denied any tingling, numbness or burning. She said she did some walking and stretching. She was sleeping only three to four hours. She did some household activity. Her neck was supple. Her low back had mild tenderness in the paraspinal and sacroiliac joint area. Her gait was antalgic and she had some difficulty walking on heels and toes. The assessment was lumbar facet joint arthropathy and sacroiliitis; morbid obesity; and trochanteric bursitis of the left AC joint. She deferred injections and was recommended she continue physical therapy and exercises.

Plaintiff presented to the hospital clinic on March 23, 2006, for follow up (R. 320). She said her stomach was feeling some better– she had rectal pain. Her grandmother had the same thing. Otherwise she was good. She was scheduled for a barium enema.

The barium enema on April 1, 2006, was normal (R. 319). It did, however, show severe degenerative changes at L4-5 with extensive facet joint arthritis and interspace narrowing.

On April 6, 2006, Plaintiff followed up with the hospital clinic regarding her stomach (R. 318). She was fearful because her pain medications just weren't working like they once did. Her body mass index was 55. She had severe back pain, knee pain, and joint pain due to pathology that was worsened by her morbid obesity. Her feet now had started hurting. She was diagnosed with herniated nucleus pulposes with radiculopathy; morbid obesity; high blood pressure; and irritable bowel syndrome ("IBS").

On April 17, 2006, Plaintiff followed up with the KNOW clinic for her chronic pain complaints (R. 278). The average severity of pain was around 4-5. She remained reasonably stable. She had not done quite as well with the decreased Soma, and had begun to have some more pain in her knees. It was noted there had been a lot of rain, and that Plaintiff was overweight and had general arthritic changes everywhere. Her medications were quite helpful. She could generally do basic activities of daily living. She had some burning in the mid-lumbar area only, but denied any numbness or tingling. She had problems with facet and SI tenderness, and some tenderness along both superior scapular borders with slight decreased range of motion of the Cervical and Lumbar spines. Both knees showed some tenderness and there was trochanteric tenderness as well. She was recommended to continue her regular walking activity and to try to lose some weight.

On April 27, 2006, Plaintiff presented to the hospital clinic for follow up (R. 316). The medication was really helping the IBS. She needed her thyroid checked. She was still going to the pain clinic for her back pain and discomfort.

On May 15, 2006, Plaintiff followed up with the KNOW clinic for her chronic pain (R. 276).

21

She said most of her pain was localized in her low back, down her side, hips and knees. Her present and usual pain level was 4 out of 10 with medications. She was taking her Percocet only about every 8 hours. She stated she could do very little of her trash removal, but could wash her dishes, clean her house, and do some yard work. She had no numbness, burning, or tingling. She had positive facet joint and SI tenderness in the lumbar spine with pain with extension, flexion, and axial rotation. There was no obvious erythema, edema or deformity. She had tenderness of both knees with arthritic signs and crepitus. She had some difficulty walking on heels and toes, and had difficulty rising from a sitting to standing position. She had a controlled antalgic gait. She was diagnosed with lumbar facet joint arthropathy and sacroiliitis; morbid obesity; and some mild trochanteric bursitis of the left AC joint. Plaintiff showed increased functional ability while taking only one Percocet every 8 hours as well as Soma and Lyrica. Injectables were again deferred. No consults were necessary. She was advised to be as active as possible, with walking, range of motion exercises, and stretching.

On June 12, 2006, Plaintiff followed up with the hospital clinic (R. 313). Over the past week she had soreness under her breasts and arms, with increased pain on deep breathing. She also had soreness and pain in her upper back, increased if pressure applied. She was diagnosed with costochondritis.

On June 13, 2006, Plaintiff presented to the KNOW clinic for follow up of her chronic pain complaints (R. 274). The average pain severity was 4-5. She had to go the ER last night for a Toradol injection. Any significant amount of activity, prolonged standing, and bending in particular, were all quite aggravating. Medications were helpful. She could generally do the basic activities of daily living although there were times she had difficulty accomplishing those. Exam showed

restricted range of motion of the lumbar spine, with tenderness throughout. No motor or sensory deficits were appreciated. Mildly increased tone was noted, with pain on range of motion testing. She was diagnosed with lumbar facet arthropathy and sacroiliitis; morbid obesity; and trochanteric bursitis and osteoarthritis of the left AC joint.

On June 22, 2006, Plaintiff presented to the hospital clinic for follow up (R. 308). She was still having epigastric pain and sternal pain, but no increased shortness of breath. The IBS was responding well to medication. She just felt "so tired." She was diagnosed with chest pain, IBS, and hypothyroid.

On July 12, 2006, Plaintiff presented to the KNOW Pain clinic for follow up (R. 374). She rated her pain at 6 on a scale of 1 to 10. She complained of lower back, hip, and knee pain, and requested an injection; however the clinic did not have authorization so she was to return after authorization. Plaintiff stated she slept an average of three hours per night and did stretches for exercise. She had a good appetite and continued to do her activities of daily living such as trash removal, washing dishes, and picking up around her house. Her husband was no longer working. Upon examination she had restricted range of motion of the lumbar spine with quite a bit of tenderness throughout the belt area. She had moderate facet and SI tenderness bilaterally as well as trochanteric bursa tenderness bilaterally. She had pain with motion of the lower back.

On July 20, 2006, Plaintiff received authorization and underwent a lumbar epidural steroid injection at the KNOW Pain Clinic (R. 373). Plaintiff went home "in good spirits, stable, and most of all the severity of the pain came down from 8 out of 10 to 0 out of 10."

Plaintiff presented to the hospital clinic on July 21, 2006 for check up (R. 360). She said she felt her thyroid may need adjusted– "my nerves are shot –" noting her husband was also disabled at

this time and finances were tough. She said she had had a nerve block yesterday due to pain and it hadn't affected the pain.

On August 10, 2006, Plaintiff presented to the hospital clinic for follow up (R. 359). She said she was losing her insurance and she was going to stop all of her pain medications. She reported the injection into her back "actually made her feel worse." She was having more radiculopathy into her legs and increased neck pain and arm pain than before the injection at the pain clinic.

On August 15, 2006, Plaintiff applied for State benefits (R. 385).

On August 31, 2006, Plaintiff presented to the hospital clinic for a physical examination for DHHR (R. 358). She said she could not work due to pain, reporting severe low back pain and pain in both hips worsened with sitting, standing, and walking. She said it "hurts like hell." She reported constant pain that throbbed, burned, and ached; sometimes sharp, stabbing pain in both legs; neck pain radiating into the scapular region with constant soreness and pain; shoulder pain; and no comfortable position to make the pain better. She reported having had physical therapy without relief, as well as pain management with injections that actually made the symptoms worse. Riding in the car 2/10 of a mile was unbearable. There was no relief from the pain. She took so many medications just to fall asleep.

Debbie Cutlip, a Physician's Assistant, completed the General Physical form for the State DHHR on August 31, 2006 (R. 383). Plaintiff was unable to work due to pain in her back that radiated down both legs, and pain in her neck and arms. Upon examination Plaintiff had decreased range of motion of the neck, with diffuse tenderness; and lumbosacral tenderness with decreased range of motion of back and knees, with positive straight leg raising at 20 degrees bilaterally. Her main diagnosis was musculoskeletal back pain with sciatica and her minor diagnosis was neck pain.

24

Ms. Cutlip opined that Plaintiff could not work full time at any job because she could not sit for extended periods of time; could not walk or lift; had to be able to lie down; and had to take pain medications just to function which caused her to go to sleep. Ms. Cutlip, did, however, opine that Plaintiff should be referred for vocational rehabilitation. On September 15, 2006, the State DHHR found Plaintiff was disabled (R. 379).

Plaintiff presented to the hospital clinic on September 25, 2006, for follow up and new pain in the center of her back into the center of her chest (R. 357). She got really weak and shaky every time she ate sweets. She also complained of left ear pain and worse radiation of pain down both legs into feet. Chest x-ray on September 25, 2006 was normal (R. 364).

Plaintiff presented to the hospital clinic on October 12, 2006, for follow up (R. 356). She had a Toradol injection that morning, but was still having pain in her low back, ears, neck, and arms. She was trying to cut back on her medications because her husband wasn't working and lost their insurance.

On November 8, 2006, Plaintiff presented to the hospital clinic for right arm and shoulder pain (R. 355). She said this was something new, and that she had had no injury. She said it felt like when she had bursitis before. It hurt with ice or heat and hurt down to her upper elbow, so that she could not rest. Also, both ears were hurting and popping. She was diagnosed with right shoulder bursitis and eustachian tube dysfunction.

On November 29, 2006, Plaintiff presented to the ER for complaints of pain starting about four days earlier (R. 348). It hurt to bend or twist. She had chronic back pain, "but this is different. Saturday she raked leaves and carried them – started the aggravation of her back." She was diagnosed with musculoskeletal back pain due to overuse (R. 349). She was given an injection of

25

Toradol.

On December 4, 2006, Plaintiff presented to the hospital clinic for follow up of her chronic problems (R. 354). She stated that riding hurt her back. She needed to sleep in a recliner. She felt terrible all the time. Her back hurt, her neck hurt, and she was still having fluid retention. The diagnosis was chronic musculoskeletal back and neck pain; high blood pressure; depression; and hypothyroid. It was noted "she cannot work at normal employment."

On December 18, 2006, Plaintiff presented to the hospital clinic for follow up of her chronic problems (R. 353). She now complained of pain in her left arm. She stated both shoulders were really hurting today in the joints and muscles. X-rays showed no fracture, dislocation or osseous destructive process in either shoulder (R. 362).

An abdominal ultrasound on December 22, 2006 was unremarkable (R. 361).

On January 15, 2007, Physician's Assistant Debbie Cutlip, Plaintiff's main provider at the hospital clinic, completed a questionnaire which was co-signed by Robert Mace, MD. (R. 365). Her medical speciality was listed as Family Medicine. She had been Plaintiff's treating physician since 1994, and stated that Plaintiff had a long history of back, neck, and right hip pain. Her present diagnosis was chronic neck, back, and leg pain; shoulder arthrosis; hypothyroid; and depression. Ms. Cutlip opined that Plaintiff could not work at the heavy, medium, or light exertional level, but could work at the sedentary level if she could change positions frequently. She could stand only 15 minutes and walk only 10 minutes at a time. She could only stand/walk 30 minutes total in an 8-hour workday and must alternate positions frequently due to chronic pain of back, neck, and shoulders. She could never climb, balance, kneel, crouch, crawl, or squat. She could infrequently stoop/bend, stretch, and reach. She could not work around machinery, jarring, or vibration, but could

work around temperature extremes, fumes, dust, noise and other hazards. It would be advisable for her to recline or lie down during the day and to have frequent sitting rest periods. She was expected to experience chronic pain at the moderate to severe level as well as severe intermittent pain. She did not need an assistive device. She could use both hands for simple grasping but not fine manipulation. Ms. Cutlip opined that Plaintiff was not capable of performing any full-time job due to her disabilities. She had no element of "functional overlay."

On February 1, 2007, counsel for Plaintiff sent Ms. Cutlip a letter asking her to clarify her questionnaire dated January 15, 2007 (above) (R. 399). Ms. Cutlip opined that Plaintiff was unable to perform her usual work and any full time work of any type because she "needs to have capability to change positions frequently, etc."

On January 22, 2007, Plaintiff underwent a Psychological Evaluation, performed by Cynthia Hagan, M.A., at the request of Plaintiff's counsel (R. 401). Plaintiff was referred for assessment of depressive and anxious symptoms. It was noted she was also applying for disability, and the evaluation would attempt to ascertain her cognitive functioning, personality patterns, behavior patterns, diagnosis, and treatment recommendations.

Plaintiff stated that if she were to return to work, she would be unable to perform adequately due to her increased physical pain and decreased psychological health. In addition to her chronic physical problems, Plaintiff reported pervasive psychological symptoms including significant anxiety and depression. The depression began when she was young and was exacerbated by the death of her grandfather in May and the death of her uncle two months ago. She described her mood as sad and stated: "It's like I'm sad all the time with no real reason." She rarely felt happiness, and was frequently agitated and angry. She felt much of her psychological difficulties were attributable to

mounting financial pressures, high levels of pain, and her inability to work. She reported occasional suicidal ideation, but denied she would act upon any such thought. She denied worries, but indicated "uncontrollable racing thoughts." Plaintiff said she was diagnosed with depression in 1988 and received medication management since then, reporting it had been somewhat helpful.

Upon mental status examination, Plaintiff was adequately dressed and groomed (R. 406). Eye contact was average and psychomotor activity was normal. She was friendly, polite and cooperative and rapport was easily established. Plaintiff's short-term memory was below average, as was concentration. She was fully oriented. Her affect was appropriate and reactive. She described her mood as worried. Her observed mood was depressed and anxious. She was able to understand and follow instructions.

IQ test results were 91 verbal, 85 performance, and 88 full scale, considered "low average" (R. 407). She read at the high school level, spelled at the 8th grade level and did arithmetic at the high school level.

On the depression scale, Plaintiff scored above the average pain patient depression score (R. 409). She also scored above the average pain patient anxiety score and somatization score. These scores were considered valid. Personality testing was also considered valid, and indicated depression and anxiety disorders in the "severe" range. She was diagnosed with Major Depressive Disorder, Recurrent, Severe, and Generalized Anxiety Disorder.

Ms. Hagan completed a Mental RFC Assessment, opining that Plaintiff would have marked limitations in interacting with the public and responding to direction and criticism from supervisors, relating in predictable ways in social situations in the workplace without exhibiting behavioral extremes, demonstrating reliability, responding to changes in the work setting, and tolerating work

stress. She would have moderate limitations in sustaining attention and concentration for extended periods, maintaining regular attendance, completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks.

Ms. Hagan also completed a Psychiatric Review Technique (PRT") finding that Plaintiff had an affective disorder and anxiety disorder, and would have marked difficulties in maintaining social functioning, moderate difficulties in activities of daily living and maintaining concentration, persistence or pace, and had had one or two episodes of decompensation, each of extended duration.

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Cannon made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2007.

2. The claimant has not engaged in substantial gainful activity since June 5, 2004 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*).

3. Since June 5, 2004, the claimant has had the following severe impairments: degenerative disc disease of the lumbar spine; developmental spondylolisthesis with L4 pars intra-articularis defect; mild osteoarthritic lumbar vertebral body lipping; cervical spondylosis; degenerative disc disease of the cervical spine; bilateral greater trochanteric bursitis; left acromioclavicular bursitis; right carpal tunnel syndrome; gastroesophageal reflux disease; hypothyroidism; allergic rhinitis; obesity; depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the demands of sedentary work with certain modifications. She must be allowed to sit or stand at will during the workday. She is unable to operate foot pedals or perform constant fine manipulation or overhead lifting. She is able to perform all postural movements occasionally, except that she cannot kneel, crawl or crouch or climb ropes, ladders, or scaffolds. She must avoid exposure to pulmonary irritants, such as fumes, dust, odors, and gases and avoid exposure to hazards, such as dangerous, moving machinery and unprotected heights. She is limited to low-stress, unskilled, entry-level work that involves one- or two-step work processes, routine, repetitive tasks, and working with things as opposed to people. She must be allowed to miss one or two days of work per month due to the symptoms of her impairments.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on April 14, 1958 and was 46 years old on June 5, 2004, which is defined as a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      The client's limitations preclude the transferability of any acquired job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P. Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 19-38).

## IV. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

The Plaintiff contends:

1. The ALJ failed to comply with and make the findings required by the Commissioner's Acquiescence Ruling AR 00-1(4)–"Effect of Prior Disability Findings on Adjudications of a Subsequent Disability Claim – Title II and Title XVI of the Social Security Act" – adopting the Fourth Circuit decision in Albright v. Commissioner, 174 F.3d 473 (4th Cir. 1999).

2. The ALJ did not make a proper Step Two Credibility Determination and eliminated evidence favorable to the plaintiff and made errors of fact.

The Commissioner contends:

1. The ALJ complied with the requirements of Acquiescence Ruling (AR) 00-1(4).

2. Substantial evidence supports the ALJ's credibility finding.

## C. AR 00-1(4)

Plaintiff first argues that the ALJ failed to comply with and make the findings required by the Commissioner's Acquiescence Ruling AR 00-1(4)–"Effect of Prior Disability Findings on Adjudications of a Subsequent Disability Claim – Title II and Title XVI of the Social Security Act" – adopting the Fourth Circuit decision in Albright v. Commissioner, 174 F.3d 473 (4th Cir. 1999). Defendant contends the ALJ did comply with the requirements of AR 00-1(4).

Pursuant to Social Security AR 00-1(4), when adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. Plaintiff argues in particular that the ALJ gave no explanation for eliminating the previous limitations in reaching overhead and a limitation from fine manipulation from the current RFC.

Plaintiff filed applications for SSI and DIB on September 28, 1999. Those applications were denied at the initial determination level on November 5, 1999, and Plaintiff did not pursue a hearing. She subsequently returned to work prior to filing for disability again on November 25, 2002, with an alleged onset date of October 12, 2002. Following denials at the initial and reconsideration levels, Administrative Law Judge Steven D. Slahta held a hearing on March 18, 2004, and entered a Decision on June 4, 2004, concluding that Plaintiff had not been under a disability as defined in the Social Security Act at any time since her alleged onset date. ALJ Slahta's decision applied to Plaintiff's condition through June 4, 2004, the date of the decision. See Albright v. Commissioner, 174 F.3d 473 (4th Cir. 1999). Unlike in Albright, the Plaintiff here appealed the June 2004 decision to this Court, meanwhile filing a subsequent application on September 17, 2004, again alleging an

onset date of October 12, 2002.   As in Albright's case, SSA considered Plaintiff's subsequent application to be a new claim, relating to her condition subsequent to the prior adjudication, *i.e.,* from June 4, 2004 onward.  Id.[2]

Before Albright, the Fourth Circuit had decided Lively v. Secretary, 820 F.2d 1391 (4th Cir. 1987).   In that case, the claimant, Lively, was found not disabled because he had the residual functional capacity for light work.  See AR 00-1(4).  Two weeks after that decision, Lively turned age 55, and would, under Rule 202.02 of the medical-vocational guidelines, be considered disabled if limited to light work. He filed a subsequent application and was again found not disabled, based on another ALJ finding he had the capacity for work at any exertional level, not only light.  The Fourth Circuit reversed, finding it "inconceivable" that Lively's condition had improved so much in two weeks as to enable him to perform medium work.  The Court held:

> Principles of finality and fundamental fairness . . . indicate that . . . [SSA] must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant was capable of performing medium work . . . [E]vidence, not considered in the earlier proceeding, would be needed as an independent basis to sustain a finding contrary to the final earlier finding.

Id.

In Albright, the Fourth Circuit explained its holding in Lively as follows:

> Rather than signaling a sea change in the law of preclusion, the result in *Lively* is instead best understood as a practical illustration of the substantial evidence rule.  In other words, we determined that the finding of a qualified and disinterested tribunal that Lively was capable of performing only light work as of a certain date was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.  To have held otherwise would have thwarted

---

[2]To the extent that a second application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of preclusion apply with full force.  Id.

the legitimate expectations of claimants – and, indeed, society at large – that final agency adjudications should carry considerable weight. Even more importantly, judicial ratification of the SSA's "bait-and-switch" approach to resolving Lively's claim would have produced a result reasonably perceived as unjust and fundamentally unfair.

Albright, 174 F.3d at 477-478.

Following the Fourth Circuit's decisions in Lively and Albright, the Commissioner promulgated AR 00-1(4), which first states the Commissioner's general position:

> In a subsequent disability claim, SSA considers the issue of disability with respect to a period of time that was not adjudicated in the final determination or decision on the prior claim to be a new issue that requires an independent evaluation from that made in the prior adjudication. Thus, when adjudicating a subsequent disability claim involving an unadjudicated period, SSA considers the facts and issues de novo in determining disability with respect to the unadjudicated period. SSA does not consider prior findings made in the final determination or decision on the period claim as evidence in determining disability with respect to the unadjudicated period involved in the subsequent claim.

However the Ruling goes on to provide:

> SSA interprets the decision by the United States Court of Appeals of the Fourth Circuit in *Albright* to hold that where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period. This Ruling applies only to disability decisions in cases involving claimants who reside in Maryland, North Carolina, South Carolina, Virginia or West Virginia at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and

circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weigh to such prior findings when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in *Lively*. An adjudicator should generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated on the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in *Albright*. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

The undersigned notes that the current ALJ did not specifically mention the weight she gave to the prior ALJ's findings. In fact, ALJ Cannon did not even mention the AR 00-1(4) by title. She did, however, make identical findings as the prior ALJ had at Steps One and Two. At Step Three, ALJ Cannon expressly and exactly named the severe impairments found by the prior ALJ: discogenic disorders of the cervical and lumbar spine without surgery; bilateral carpal tunnel with right release in March 2004 and left carpal tunnel release in January 2004; high blood pressure controlled with medication; mild shoulder problems; foot and heel spurs and left plantar capsulitis/metatarsalgia treated with orthotics; history of allergic rhinitis; gastroesophageal reflux disease; hypothyroidism; osteoarthritis; depressive disorder; and chronic pain syndrom with neck and back pain (R. 22 and See Finding 3 at R.63). ALJ Cannon then expressly incorporated by reference the summary of the

medical records related to these severe impairments contained in the prior hearing decision. Further, the evidence from the prior decision as well as the actual decision itself was incorporated into the record. ALJ Cannon then considered the longitudinal record as well as the additional evidence submitted with the current applications.

ALJ Cannon then found that, since June 5, 2004, Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine; developmental spondylolisthesis with L4 pars intra-articularis defect; mild osteoarthritic lumbar vertebral body lipping; cervical spondylosis; degenerative disc disease of the cervical spine; bilateral greater trochanteric bursitis; left acromioclavicular bursitis; right carpal tunnel syndrome; gastroesophageal reflux disease; hypothyroidism; allergic rhinitis; obesity; depressive disorder; and generalized anxiety disorder.

With the exception of omitting the "foot and heel spurs and left plantar capsulitis/metatarsalgia treated with orthotics," and "high blood pressure controlled with medication," found by the prior ALJ, ALJ Cannon only added to the severity of Plaintiff's impairments or added severe impairments, such as bilateral greater trochanteric bursitis and left acromioclavicular bursitis; right carpal tunnel syndrome; and generalized anxiety disorder. ALJ Cannon then noted, as did the prior ALJ, that Plaintiff's hypertension has been "controlled with prescribed medication" and that this condition therefore resulted in no significant limitations. ALJ Cannon further found Plaintiff "failed to document any ongoing treatment by a podiatrist during the period in question for any spurs or other conditions." The undersigned finds substantial evidence supports both these findings.

The undersigned finds that ALJ Cannon did consider as evidence the previous ALJ's findings at Steps 1, 2, and 3, and the evidence supporting those findings. Further, even if ALJ Cannon were

found to have erred by failing to expressly state the weight accorded the earlier findings, that error would be considered harmless, as Plaintiff has shown no prejudice from that failure. Instead, ALJ Cannon actually found more severe impairments than had ALJ Slahta.

Plaintiff in particular argues regarding her Residual Functional Capacity ("RFC"). The previous ALJ found that Plaintiff could work at the sedentary level with a sit/stand option; with occasional postural movements; with use of the hands primarily for gross grasping strength; with no repetitive over head reaching; with no foot pedals; with no hazards; and with unskilled and low stress work, which he defined to include entry level work with one to two step processes and routine and repetitive tasks dealing primarily with things, not people (R. 64).

ALJ Cannon likewise found Plaintiff could work at the sedentary level with a sit/stand option. She also found Plaintiff could perform only occasional postural movements but added that she could do no kneeling, crawling crouching or climbing ropes, ladders or scaffolds; no foot pedals; no hazards or exposure to pulmonary irritants; without constant fine manipulation or overhead lifting; at a low stress, unskilled, entry-level job that involves one-to-two-step work processes, routine, repetitive tasks, and working with things as opposed to people. She must be allowed to miss one to two days of work per month due to the symptoms associated with her impairments.

The two RFC's are nearly identical. ALJ Cannon actually added the limitations that Plaintiff not be required kneel, crawl, crouch, or climb ropes, ladders, or scaffolds; have no exposure to pulmonary irritants; and, most significantly, that she be allowed to miss one to two days of work per month due to her symptoms.

On the other hand, ALJ Cannon did, as Plaintiff argues, omit a limitation found by the prior ALJ regarding "use of the hands primarily for gross grasping strength;" and "no repetitive over head

reaching." Instead, ALJ Cannon limited Plaintiff to "no constant fine manipulation" and "no overhead lifting." ALJ Cannon then recited the diagnostic studies, and then cited a consultative examination by Dr. Khorshad, performed after the last ALJ decision, and finding Plaintiff had full range of motion of the neck, back, and all joints. Dr. Khorshad particularly noted Plaintiff's good range of motion, and opined that it was possibly due to a good response to her medications. There were no sensory or reflex abnormalities, no assistive device was used, Plaintiff was able to get on and off the examining table, upper and lower extremity strength was 4/5 and fine manipulation was normal (R. 29). ALJ Cannon also cited Dr. Epstein's examination which showed neck range of motion was normal. Her left shoulder was tender at the AC joint, but otherwise muscle strength was 5/5 throughout and sensation was intact.

ALJ Cannon also considered that in January 2006, more than 1½ years after the prior decision, Plaintiff was evaluated for complaints of carpal tunnel syndrome symptoms that had been present "for approximately one year." Neurological exam was normal. An EMG in February 2006 showed mild to moderate right carpal tunnel syndrome.

The undersigned finds ALJ Cannon did consider the earlier finding regarding Plaintiff's hand and arm limitations, but then explained her reasons for altering those limitations. Significantly, the first ALJ hearing and decision were made only months after Plaintiff's carpal tunnel surgery, when there could reasonably be more limitations during healing. The undersigned finds substantial evidence supports the ALJ's RFC and also that her findings and explanation for those findings comport with the requirements of AR 00-4(1), but more importantly, with the Fourth Circuit holdings in Lively and Albright.

Most significantly, however, the undersigned notes that Plaintiff argues regarding the

limitations contained in the previous decision, that Plaintiff could use her hands primarily for gross grasping strength as opposed to repetitive fine manipulation, and with no repetitive over head reaching. The ALJ included those limitations in his hypothetical to the VE (R. 1129-1130). In response, the VE identified the job of surveillance system monitor at the sedentary level (379.367-010), with a least 700,000 jobs in the national economy and at least 4,000 jobs in West Virginia (R. 1130). As the prior ALJ expressly found, the VE thus indicated this job "would accommodate the claimant's hand use capabilities" (R. 62). In the subsequent hearing, the VE also named the job of surveillance system monitor (with the same DOT number) at the sedentary level as one Plaintiff could perform (R. 1175). Further, in the subsequent hearing, counsel expressly asked the VE to add a limitation that Plaintiff could reach only infrequently. The VE testified that limitation would not affect any of the jobs he named. There is therefore substantial evidence to support a finding that even if Plaintiff had the limitation on fine manipulation found by the prior ALJ, it would still not eliminate the surveillance system monitor jobs.

The undersigned therefore finds substantial evidence supports the finding of the ALJ that Plaintiff could perform the job of sedentary surveillance system monitor. The undersigned also finds that that job, alone, exists in significant numbers in the national economy.

For this additional reason, the undersigned finds that even if the ALJ had erred by failing to precisely follow AR 00-4(1), that error would be harmless, because Plaintiff has failed to show any prejudice resulting from that alleged failure.

### D. Credibility

Plaintiff next argues that the ALJ did not make a proper Step Two credibility determination and eliminated evidence favorable to the plaintiff and made errors of fact. Defendant contends

substantial evidence supports the ALJ's credibility finding.

In Craig v. Chater, 76 F.3d 585, 595 (1996), the Fourth Circuit provided the factors the ALJ should consider in determining credibility as follows:

> Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

A review of the ALJ's decision shows she complied with the mandates contained in the credibility analysis of Craig, supra, as well as the criteria listed in SSR 96-7p and 20 C.F.R. 404.1529. Specifically, the ALJ considered and evaluated Plaintiff's own statements regarding her pain and limitations; the laboratory findings; the objective medical evidence of pain; statements, opinions, and diagnoses of Plaintiff's treating and examining physicians; Plaintiff's activities of daily living; and medical treatment and medications used to alleviate pain.

In particular, the ALJ recited the longitudinal record regarding Plaintiff's treatment at the Know Pain Clinic from July 2004 until July 2006 (R. 30-31). Plaintiff's reported level of pain during these visits ranged from 9½ out of 10 in April 2005, down to 2 out of 10 less than two months later. She reported that a TENs Unit and heating pad were somewhat helpful. Generally, she stated her medications were helpful. She reported on July 20, 2005, that she could generally do the basic activities of daily living as long as she had her current medications. She again reported she could do the basic activities of daily living on August 17, September 13, and December 9, 2005. In

February 2006, Plaintiff reported that pain medications and injections were not helping. She reported increased muscle spasms over the past two to three weeks. She was prescribed Percocet, and when seen one month later, rated her pain at level one. She reported staying functional and that she was able to do daily activities. One month later, she reported improved functional ability and quality of life with her medications. In May 2006, her reported pain level was about 4, and she was only taking the Percocet once every eight hours. Although she could do "very little of her trash removal," she could wash dishes, clean house, and do some yard work. On July 13, 2006, Plaintiff again reported she could generally do the basic activities of daily living although there were times she had difficulty finishing them. She rated her pain at 4-5 out of 10. Her last documented visit to the pain clinic was on July 12, 2006, when she rated her pain at level 6. She reported continuing to do her activities of daily living around the house, including trash removal, washing dishes, and picking up around the house.

Plaintiff cites only one example of the ALJ's having made errors of fact or eliminating evidence favorable to her in determining her credibility. The ALJ stated:

> Although the claimant alleged that she had been to the hospital about one time per month during the past year to get a shot to relieve her back pain, the reports from the treating pain clinic reveal only one emergency room visit, in June 2006 . . . and the claimant has documented only one other emergency room visit on November 29, 2006 when she was treated for musculoskeletal back pain secondary to overuse.

Plaintiff argues this statement is erroneous, and that she had testified:

A:    If it gets real, real bad my husband will take me to the hospital and they'll give me shots of Toradol, sometimes a steroid shot too . . . ."

Q:    How many times have you had to go to the hospital in the last year or so?

A:    I'm not for certain but usually I have to go about once a month

(R. 1154). Plaintiff does not dispute the ALJ's finding that she only needed to go to the ER twice during the entire relevant time period. That finding is not in error. Further, the undersigned finds the ALJ reasonably could have interpreted this testimony to mean that Plaintiff needed shots about once a month. The evidence, shows, however, that she received shots far less often than once a month, in general. Substantial evidence therefore supports the ALJ's determination that this testimony was not credible.

Plaintiff explains that the medical records indicate she visited the hospital clinic approximately once per month to see Ms. Cutlip, a Physician's Assistant, and that she obtained pain injections there, as well as at the Know Pain Clinic, the Hope Medical Center, and the ER. She then states she was given injections on April 26, 2005; August 15, 2005; September 13, 2005; February 15, 2006; June 12, 2006, July 20, 2006; October 12, 2006; November 8, 2006; and November 29, 2006 (Plaintiff's brief at 13-14). Plaintiff herself references only 9 visits for injections in 19 months, not once per month. Further, the ALJ had asked the question regarding "the past year" (prior to February 26, 2007), during which time Plaintiff herself noted only 5 such visits. The record also indicates Plaintiff "deferred injections" when offered on July 23, 2004, September 23, 2004, June 22, 2005, July 20, 2005, December 9, 2005, January 20, 2006, February 17, 2006, March 17, 2006, and May 15, 2006.

Like the ALJ, the undersigned finds it significant that the ER visit on November 29, 2006, the last documented pain injection, was for pain that occurred after "she raked leaves and carried them," which "started the aggravation of her back" (R. 348). She said at that time that she had chronic back pain, "but this is different." It hurt "to bend or twist." She was diagnosed with musculoskeletal back pain due to overuse.

In a related matter, Plaintiff moves the Court to include "lost" documents [Docket Entry 15]. The documents are "two pages from the Webster County Memorial Hospital Clinic together with the forwarding letter dated October 4, 2005." Plaintiff states, correctly, that these pages were not found in the transcript. The Plaintiff therefore asks this court to allow additional evidence to be added to the transcript.

A district court may only order additional evidence to be taken before the Commissioner upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding." Smith v. Chater, 99 F.3d 635 (4th Cir.1991). Evidence is considered new "if it is not duplicative or cumulative" and "material if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins v. Sec'y, Dep't. of Health and Human Servs., 953 F.2d 93 (4th Cir. 1991).

The undersigned believes that admission is not warranted in this case. Plaintiff has made no showing that there was good cause for the failure to incorporate the documents in a prior proceeding. If the Court considers these records it would be considering evidence never before the Commissioner. Further, the documents are not material because they would not reasonably have changed the outcome. According to Plaintiff's own motion, the documents purportedly show she received injections at the hospital clinic on March 24, 2005, April 29, 2005, and September 14, 2005. These three dates are not within "the past year" referenced in the question. The inclusion of these documents still does not support Plaintiff's contention that she received shots about once per month. In particular, even including those dates, there would be, in less than a two-year time span, as much as five months between injections.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's

credibility finding.

## V. MOTION TO REMAND

After filing her Motion for Summary Judgment on September 24, 2009, Plaintiff filed a

Motion to Remand [Docket Entry 17]. The Motion requests the Court remand Plaintiff's case to

the Commissioner "for consideration of new and material evidence pursuant to Borders v. Heckler,

777 F.2d 954 (4th Cir. 1985)."

In Smith v. Chater, 99 F.3d 635, 638 n5 (4th Cir. 1996) (citing United States v. Carlo Bianchi

and Company, 373 U.S. 714-15 (1963), the Fourth Circuit stated:

> Smith also submitted additional evidence to the district court
> (evidence not submitted during the administrative proceedings) that
> she contends should have been considered in reviewing her case or,
> in the alternative, that called for the district court to remand her
> claims to the ALJ for further consideration.
>
> The district court did not err by refusing to consider this additional
> evidence or by refusing to remand the case so the ALJ could do so.
> First, in determining whether the ALJ's decision is supported by
> substantial evidence, a district court cannot consider evidence which
> was not presented to the ALJ. See *United States v. Carlo Bianchi &
> Co.*, 373 U.S., 709 714-15, 83 S.Ct.1409, 1413-14, 10 L.E.2d 652
> (1963). Second, the additional evidence was not new or material, and
> therefore, did not warrant remand here. *See* 42 U.S.C.A. §405(g)
> (West Supp. 1996) (The district court may only order additional
> evidence to be taken before the Commissioner upon a showing that
> there is new evidence which is material and that there is good cause
> for the failure to incorporate such evidence into the record in a prior
> proceeding.

Plaintiff submitted to the Court an award notice indicating that the Commissioner found she became

disabled on May 30, 2007 (the day after the ALJ's unfavorable decision in this matter). The date

of this award notice is November 25, 2007. As Plaintiff herself concedes, there must be "good

cause" for the Court to consider late submission of the evidence. The only "good cause" stated by

Plaintiff for the failure to submit the evidence at the administrative level is that counsel did not represent her on the subsequent application and therefore counsel did not have notice of the award. Obviously, however, Plaintiff had notice of the award, as she began receiving payments in December 2007. During that same period, Plaintiff submitted more than 50 pages of new evidence to the Appeals Council. The undersigned therefore finds Plaintiff has not shown good cause for her failure to submit the new evidence to the Commissioner, where it could have been considered by the administrative agency.

Additionally, Plaintiff did not submit to the Court anything other than the Notice of Award. The undersigned therefore has no way to determine whether the subsequent, favorable award was based on a worsening of her condition since the last decision, or even simply on the basis of her age changing.[3] One of the ALJ's bases for finding Plaintiff not disabled was her lack of treatment by any actual mental health care provider. In her request for reconsideration to the Appeals Council, counsel states:

> Since the hearing, Claimant has sought treatment at Seneca Mental Services, Inc. The records of that treatment are attached. Given the ALJ's emphasis on the lack of mental health treatment, the Claimant moves for a remand based upon the Seneca records, obviously evidence that could reasonably be expected to effect the outcome on the issue of "disability."

The first record from Seneca is a Psychiatric Evaluation, performed on July 18, 2007, <u>five</u>

---

[3]For example, Plaintiff was just 46 on the date she applied for benefits, considered a "younger person" under the regulations. She would have been 50 years old, however, considered "closely approaching advanced age" on April 14, 2008. At age 50, with the same limitations, she would be considered disabled under Table No. 1, Rule 201.12. SSA, pursuant to its own regulations, "will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case." On November 25, 2007, the date of the new decision, she was 49 and 7 months old.

months after the hearing and two months after the ALJ's decision (R. 1008). This is noted to be her first time at Seneca. Significantly, her chief complaint is: "My depression got worse." The Appeals Council did have these documents and found they would not have changed the ALJ's determination.

For all the above reasons, the undersigned finds Plaintiff has not met her burden of showing "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Smith v. Chater, supra, at n. 5.


## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Plaintiff's Motion to Include Lost Documents [Docket Entry 15] be **DENIED**; Defendant's Motion for Summary Judgment [Docket Entry 22] be **GRANTED,** Plaintiff's Motion for Summary Judgment [Docket Entry 14] be **DENIED,** Plaintiff's Motion to Remand [Docket Entry 17] be **DENIED,** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn,

474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___15___ day of ___July___, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE